## Gill v. Pacor, Inc.

*Joseph O. Shein*, for plaintiff.

*Daniel J. Ryan, Jr.*, for defendant, Johns-Manville Amiante Canada, Inc.

TAKIFF, *J.*, August 13, 1982—Motions for Judgment n.o.v. and, in the alternative, for a new trial were submitted by defendant Johns-Manville Amiante Canada, Inc., (hereinafter Johns-Manville). Plaintiffs also submitted a motion for partial new trial.*

The thrust of this lawsuit was that husband-plaintiff was injured by his exposure to asbestos fibers and asbestos-containing products supplied, inter alia, by defendant during the course of his employment as an oven unloader at the Philip Carey plant during the 1940's and as an electrician at the Nicolet plant from 1973 until 1977. Wife-plaintiff's claim was for loss of consortium. A protracted jury trial resulted in a verdict of $125,000 compensatory damages in favor of plaintiffs.

We address each motion separately.

## I. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

In its motion for judgment n.o.v., Johns-Manville argues as a matter of law that its conduct in supplying asbestos fiber was not the proximate cause of injury, that the conduct of husband-plaintiff's employer, Philip Carey, was the superceding cause of harm, that Johns-Manville had no duty to warn of the dangers of asbestos and that this court erred in

---

*On April 23, 1982 upon consideration of the above motions and answers thereto and after oral argument held on February 24, 1982, this court entered its orders denying defendant's motions for judgment n.o.v. and new trial and plaintiff's motion for partial new trial.

denying defendant's motion to bifurcate the issues of liability and punitive damages.

A judgment n.o.v. should be entered only in a clear case in which the evidence and all reasonable inferences therefrom are considered in the light most favorable to the verdict winner, in whose favor all doubts must be resolved: Atkins v. Urban Redevelopment Authority of Pittsburgh, 489 Pa. 344, 414 A. 2d 100 (1980); Broxie v. Household Finance Co., 472 Pa. 373, 372 A. 2d 741 (1977). In light of this standard, we deny defendant's motion for judgment n.o.v. for the reasons explicated below and also deny its motion for new trial in Part III, infra.

a. Failure to Warn as Proximate Cause of Injury

Johns-Manville contends that it is entitled to entry of judgment notwithstanding the verdict because the absence of warnings on the asbestos products it supplied to the Philip Carey plant in the 1940's was so remote a factor in husband-plaintiff's asbestos-related injury that as a matter of law such conduct could not have been the proximate cause of that injury.

In Liney v. Chestnut Motors, Inc., 421 Pa. 26, 218 A. 2d 336 (1966), the Pennsylvania Supreme Court said:

It is true that the question of proximate cause is generally for the injury. However, if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law.

In like manner, in a federal court case applying Pennsylvania Law, Chief Judge Lord held that judgment for the manufacturer-defendants was

appropriate because it required "guess or conjecture [for the jury] to determine how the accident could have been avoided by following the warnings." Greiner v. Volkswagenwerk Aktiengesellschaft, 429 F. Supp. 495, 498 (E.D. Pa. 1977). Before disturbing a verdict, a line must be drawn between situations where the jury can draw a "reasonable inference" from the evidence presented at trial and those situations where only "conjecture" is possible.[1] To draw this line, we must consider the evidence which the jury could have considered in reaching its verdict as to legal cause.[2]

---

1. In Com. v. Whitman, 199 Pa. Super. 631 at 634, 186 A. 2d 632 at 633 (1962) the court said: ·

"Inference is a process of reasoning by which a fact or proposition sought to be established . . . is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted."

See, Simon v. Fine, 167 Pa. Super. 386, 391, 74 A. 2d 674 (1950). See also, Mitchell v. Machinery Center, Inc., 297 F. 2d 883 (10th Cir. 1961); In re: Dilios' Will, 156 Me. 508, 521, 167 A. 2d 571, 578 (1960).

2. Special Interrogatories submitted to the Jury and Answers supplied read as follows:

1. (a) Was the plaintiff exposed at any time to asbestos fiber of Johns-Manville during the years 1943-45 while employed at Philip Carey? Yes X No

(b) Was the plaintiff exposed at any time to asbestos fiber of Johns-Manville during the years 1973-77 while employed at Nicolet? Yes X No

2. Was the asbestos fiber of defendant Johns-Manville defective as the Court has defined "defective product?" If the answer to #1(a) is "yes," (a) During the mid-1940's when Mr. Gill was employed at Philip Carey Co.? Yes X No

If the answer to #(b) is "yes," (b) From 1973 to 1977 when Mr. Gill was employed at Nicolet? Yes No X

3. Answer 3(a) *only* if your answer to 2(a) was "yes." (a) Was such defect a substantial factor in causing Mr. Gill's

 

During direct examination of husband-plaintiff, the following exchange occurred regarding husband-plaintiff's awareness of bags of asbestos fiber during the period of his employment at the Philip Carey plant:

Q. [Mr. Shein] With regard to these bags that you have described, sir, did you know where the asbestos in them came from?
A. [Mr. Gill] No, sir.
Q. Did you look at the bags and see if there was a name on the bag?
A. Yes, sir.
Q. What was the name on the bag?
A. The only name I seen on the bag was Johns-Manville.
Q. Johns-Manville. Now, how often did you see those bags there?
A. Quite often.

---

asbestos related pulmonary condition while he was employed at Philip Carey Co.? Yes X No. Answer 3(b) *only* if your answer to 2(b) was "yes." (b) Was such defect a substantial factor in causing his asbestos related pulmonary condition while he was employed at Nicolet? Yes No NO ANSWER

4. Do you find that defendant Johns-Manville was negligent as to the plaintiff, Earl Gill: (a) When Mr. Gill was employed at Philip Carey Co.? Yes X No (b) When he was employed at Nicolet? Yes No X

5. Answer 5(a) *only* if your answer to 4(a) was "yes." (a) During Mr. Gill's employment at Philip Carey Co., was the negligence of defendant a substantial factor in causing plaintiff's asbestos related pulmonary condition? Yes X No

Answer 5(b) *only* if your answer to 4(b) was "yes." (b) During plaintiff's employment at Nicolet, was defendant's negligence a substantial factor in causing plaintiff's asbestos related pulmonary condition? Yes No NO ANSWER

Q. Can you tell me what you mean by "quite often?"

A. Well, practically every day you would see them.

The direct examination continued:

Q. When you finished your work day will you tell the jury what you looked like?

A. I looked like a snowman.

Q. Will you tell the Jury in what parts of your body, if at all, you had this asbestos dust?

A. I had it all over. In my mouth, in my ears, all over.

Q. Did you believe, sir, at that time that there was anything dangerous or hazardous about inhaling that dust?

A. No, sir.

Q. Did you ever see any warnings on those bags at that time?

A. No, sir.

Husband-plaintiff was also questioned about his exposure to asbestos fiber at the Nicolet plant between 1973 and 1977.

Q. [Mr. Shein] (Continued) While you were at Nicolet, did you see raw containers of asbestos?

A. [Mr. Gill] Yes, sir.

Q. Did you look at those containers to see what names were thereon?

A. Yes, sir.

Q. Will you tell the jurors what names you saw?

A. I seen Johns-Manville name on the bales.

Q. Can you describe the bales?

A. Well, they were approximately the same size as the ones from Philip Carey.

Q. How did the name appear on them?

A. It was across the top of the bag, and it was a JM on the middle of the bag.

Q. Do you remember what color?

A. JM was in a white with blue background.

Q. Now, while you were working at Nicolet, did you come in contact with that raw asbestos fiber again?

A. Just if you were working in the department where it was being used.

Q. Did you do work in the department where it was being used?

A. Yes, sir.

Q. How often?

A. Mostly every day.

Q. When you finished your day's work, sir, what did you look like?

A. I was back being a snowman again.

Finally, on cross examination, the following exchange occurred:

Q. [Mr. Fitzgerald] Now, you said the first time you saw a warning on a bag of asbestos was in 1975 at Nicolet?

A. [Mr. Gill] Yes, sir.

Q. I would like to read you a caution warning and ask you if this was on the bag of asbestos from Johns-Manville.

. . .

Q. (Continued) The words "Caution, contains asbestos fiber. Avoid creating dust. Breathing asbestos dust may cause serious bodily harm." Is that the warning you read, sir?

A. No, sir.

Q. Pardon me?

A. No, sir.

Q. It did not say that, is that correct?

A. Not to the best of my ability, no.

Q. Might it have said that?

A. To my knowledge, no.

Q. Would you tell me, again, what you do remember it saying, sir?

A. "Caution. May be hazardous to your health."

We summarized this evidence in our charge to the jury and discussed the legal standards for recovery under alternative theories of negligence and strict liability. In our view, the jury could have *reasonably inferred* from this evidence in light of the stated legal standards defined by the court that the absence (or inadequacy) of warnings during husband-plaintiff's period of exposure at the Philip Carey plant, was a substantial factor in causing the injury from asbestos exposure which he suffered. This was a fact issue appropriately submitted to the jury. The discriminating manner in which the verdict was rendered in answer to interrogatories (n.2, supra.) confirms the total comprehension of the instructions and a selective fact conclusion by the jury.

Defendant also suggests that husband-plaintiff would not have heeded warning labels had they appeared on the bags of fiber at Philip Carey and had they been adequate to convey the true nature and extent of the danger of exposure. Under the evidence presented at trial and in accordance with the instruction of the court, we conclude that a reasonable inference to the contrary could have been and in fact was drawn by the jury.[3]

---

3. In our charge to the jury, we stated:

"In reaching a conclusion in this area, in the review of all the evidence, you may apply the inference that where a warning is given, the seller or supplier may reasonably assume that it will

Finally, Johns-Manville argues that the conduct of Philip Carey as husband-plaintiff's employer was the proximate cause of injury by failing to provide a safe working environment or that such conduct was a superceding cause of plaintiff's injury. We addressed a similar point in Noecker v. Johns-Manville Corporation, et al., C.C.P. Philadelphia, April term, 1977, no. 366 (118), opinion sur motions for judgment n.o.v. and new trial, dated April 28, 1982, at 27 (hereinafter cited as Noecker).

Defendant's contention that the absence of adequate warnings on the Johns-Manville products cannot as a matter of law be considered the proximate cause of husband-plaintiff's asbestos-related injury is devoid of merit. Arguing that the responsibility for the injury lies with husband-plaintiff's employer for failing to provide a safe work place, Johns-Manville overlooks the basic tenet of product liability under Section 402A that imposes on the supplier of a product the non-delegable duty to the ultimate consumer to guarantee the safety of the product for its intended use. Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 337 A. 2d 893, 903 (1975). In the context of a failure-to-warn case, the duty owed by the supplier of a product to provide warnings or instructions that will reach the ultimate user of the product cannot be avoided by de-

---

be read and heeded . . . conversely, however, where no warning is given, you may apply the inference that the user should have read and followed an adequate warning had such an adequate warning been given.' (N.T. 9.85-86)

See, Noecker v. Johns-Manville Corporation, et al. CCP. Phila., April term, 1977, No. 366 (118), Opinion Sur Motions for judgment n.o.v. and new trial, dated April 28, 1982, at 27. (hereinafter cited as Noecker).

flection onto an intermediary in the chain of distribution. Given a defective condition in the product, the supplier "is responsible for all the unforeseen consequences thereof no matter how remote, which follow in a natural sequence of events." 462 Pa. at _____, 337 A. 2d at 903.

Our discussion in Noecker applies with equal force here.[4] Accordingly, we discern no basis on which to overturn the jury's conclusions regarding legal cause as a matter of law.

Defendant also contends that it is entitled to the entry of judgment notwithstanding the verdict because the conduct of the employer, Philip Carey, was a superceding cause of plaintiff's injuries. Defendant made an offer of proof concerning the extent of the employer's knowledge of the hazards of working with asbestos and the duties arising from this knowledge, which we denied.[5] Had this evidence been accepted, it presumably would have supported defendant's arguments regarding the sophisticated employer defense,[6] and the company's argument regarding superceding causation. In our jury charge, we instructed that body as follows:

---

4. For these reasons and for the reasons stated at 9, infra we also reject Johns-Manville's contention that husband-plaintiff's employer, Philip Carey, knew of the dangers of prolonged asbestos exposure during husband-plaintiff's period of employment, that Johns-Manville knew that Philip Carey had such knowledge, and, as a result of Philip Carey's being a so-called "sophisticated employer," that Johns-Manville's duty to warn as the supplier of the product was nullified.

5. Philip Carey was not a party to this action at the time of trial.

6. See n. 4, supra.

One of the assertions of the defendant is that the failure of the plaintiff's employers to provide respirators or to have a suitable system of dust control constitutes what is known in the law as a superceding cause of harm to the plaintiff, and that such being the case, defendant is not liable for the plaintiff's injuries.

You are instructed that under our law the acts of a third person, such as an employer, even if that act is the commission of an intentional wrong or even a crime, it is not a superceding cause if the original actor at the time of his negligent conduct realized or should have realized that the likelihood that such a situation might be created, or a third person might avail himself of the opportunity to commit a negligent act.

Stated another way, the conduct of an employer will not relieve a negligent supplier or producer or manufacturer from liability unless the employer's acts were so extraordinary that they could not have been reasonably foreseeable.

There is substantial support in the cases for this instruction as an accurate statement of Pennsylvania Law. See, e.g. Whitner v. Von Hintz, 437 Pa. 448, 263 A. 2d 889 (1970); Hennigan v. Altantic Refining Co., 282 F. Supp. 667, 678-9 (E.D. Pa. 1967), aff'd 400 F. 2d 857 (3d Cir. 1968) and cases cited therein. A superceding cause is that intervening act or omission which effectively prevents defendant's negligence from being a substantial causative factor in bringing about the accident: Restatement (Second) of Torts, §441(2). Accordingly, a subsequent act is *not* a superceding cause insulating defendant from liability if defendant's conduct was a substantial contributing factor to the event, either by creating or by increasing the risk of harm from the reasonably foreseeable sub-

sequent acts of another: Restatement (Second) of Torts, §§442A, 442B. See also, Ford v. Jeffries, 474 Pa. 588, 379 A. 2d 111 (1977).

In the matter sub judice, the jury specifically found that Johns-Manville was a substantial factor in causing husband-plaintiff's asbestos-related pulmonary condition. See n.2, supra. We see no basis for disturbing the fact finder's implicit conclusion that the employer's conduct was not a superceding cause of harm so as to exculpate defendant.

### b. Duty to Warn as a Matter of Law

Defendant argues that this verdict must be overturned because the overwhelming weight of the evidence compels a finding that Johns-Manville had no duty to warn, as a matter of law. In particular, defendant suggests that according to testimony presented at trial, the information existing in the medical and industrial community which had been the subject of extensive "State of the Art" inquiry, made the hazards of asbestos use during the 1940's so obvious that it had no duty to warn of these clearly recognizable dangers.

We instructed the jury on obvious dangers and the necessity or lack of necessity for warnings under these circumstances.

The necessity of a warning by a supplier or a manufacturer depends upon all the circumstances of the nature of the product, its hazards and risks, and the knowledge of the ordinary user or consumer who performs or uses it with the ordinary knowledge of the community as to the characteristics of the product at the time of the occurrences which are the subject of the claim.

A danger which is inherent in a product that is not

obvious and that is not commonly known and perceived by the class of persons of whom the injured user is one, is a defect against which a user must provide a sufficient warning or suffer legal liability for the damages caused by a defective product.

Whether and to what extent a seller is required to warn about the dangers of a product depends on what knowledge of a product is possessed at that time by the ordinary user who has the ordinary knowledge common to the community about the characteristics and the hazards of the products with which he will be working.

Remembering that the seller represents that his product will do the job suitably and safely and guarantees that it is free of defects, we must inquire as to whether the asbestos could be utilized safely and without injury in the manner the ordinary consumer would expect it to perform at the times Mr. Gill was exposed to it if no warnings or if insufficient or inadequate warnings were provided.

In addition, we further charged:

[I]f something in the nature of a product makes it dangerous to human life or health when used for the purpose for which it is intended, it is the obligation and responsibility of the seller to give adequate warnings to the user to inform of the dangerous quality and to provide adequate instructions to safeguard against the hazards of normal use.

This, I say, is the particular defect that is alleged by the plaintiff here. Mr. Gill claims that the materials he was exposed to and used were defective because asbestos fiber can be dangerous to health if inhaled or ingested, and they did not carry any warnings, or, if they did at some time carry warnings, at the time he was exposed to them the cau-

tions or warnings were not sufficient and were not of the quality of information and instruction required to satisfy the standard of the law.

Now, members of the jury, no witness or party has seriously challenged the fact that asbestos fiber can be harmful to one using or exposed to it, depending upon how long one is exposed and how much quantity of exposure or inhalation is suffered. You may, therefore, find, members of the jury, that asbestos fiber is dangerous and requires adequate warnings to the users in order to avoid being defective.

• • •

If you determine that the asbestos fiber to which Mr. Gill was exposed was marketed and sold without any warnings, they could be defective.

If you decide that some of the products were sold with warnings or caution labels on the bags but without warnings adequate to fully inform a consumer of risk or dangers in handling or using it, the product would also be defective.

Now, if injury resulted from exposure under either of these circumstances, the seller would be legally liable in damages for the injuries caused by the inhalation or ingestion of the asbestos fiber.

Without reviewing the substantial evidence presented at trial on the dangers of asbestos products, in our view, the jury could reasonably find that the hazards of asbestos use were not obvious to ovenloaders such as plaintiff in the 1940's and, hence, Johns-Manville had a duty to warn of the attendant dangers of its asbestos products to render them non-defective for their intended purpose. From this perspective, the verdict was not erroneous as a matter of law.

### c. Bifurcation of the Issues of Liability and Punitive Damages

Prior to the beginning of trial, we denied an oral motion by Johns-Manville for bifurcation of the issues of liability and punitive damages. Defendant contends that this decision warrants our overturning of the verdict. We do not agree.

Courts, both state and federal, have been unanimous in holding that the decision to bifurcate and to regulate the order of proof at trial is within the sound discretion of the trial judge: Agate v. Dunlevy, 398 Pa. 26, 156 A. 2d 530 (1959); Sutton v. Stoer, 335 Pa. 403, 406, 6 A. 2d 809 (1939); First National Bank v. Baird, 300 Pa. 92, 150 A. 165 (1930); Abbott v. Auto Finance Co., 287 Pa. 505, 510, 135 A. 223 (1926); Swanger v. Pyles, 204 Pa. Super. 72, 203 A. 2d 488 (1964). See Pennsylvania Rules of Civil Procedure 126, 213(b) and 224. See also Kushner v. Hendon Construction Inc., 81 F.R.D. 93 (M.D. Pa.), aff'd without opinion 609 F. 2d 502 (3d Cir. 1979). "Such discretion, however, is not arbitrary but legal. It must be exercised on the basis of balancing the respective rights of the parties." Agate v. Dunlevy, 398 Pa. at 29.

Consonant with this mandate and after consideration of issues such as judicial economy and the complexity of the facts and legal theories involved in this particular action the decision not to bifurcate was made. We were aware, based on the pleadings and counsel's response to our inquiry, that plaintiff was proceeding to trial on the negligence and strict liability counts. The evidence on punitive damages could also be relevant to the jury

as to negligence. Hence, our decision not to bifurcate. We stand on that decision.[7]

## II. PLAINTIFF'S MOTION FOR PARTIAL NEW TRIAL

Plaintiff moves for a partial new trial on the ground that we refused to submit the issue of punitive damages to the jury due to insufficient evidence. Noting that the granting of a new trial is within the discretion of the trial court, subject to review for manifest abuse of discretion or clear error of law, Bohner v. Eastern Express, Inc., 405 Pa. 463, 175 A. 2d 864 (1961); Canery v. Southeastern Pennsylvania Transportation Authority, 167 Pa. Super. 382, 402 A. 2d 1093 (1979); Eldridge v. Melcher, 226 Pa. Super. 381, 313 A. 2d 750 (1973), we deny plaintiff's motion for the following reasons.

At the beginning of trial, plaintiff's counsel initiated the discussion of punitive damages in the context of Dr. Katherine Sturgis' videotape deposition testimony.

Mr. Shein: Your Honor, we have a punitive damage claim here, and we feel that it is vitally important to show what was really known. We would lose that in accepting this offer. So I respectfully cannot accept it.

---

7. Evidence was introduced at trial which related both to the issues of punitive damages and negligence. At the end of plaintiff's case, the court ruled that there was insufficient evidence to submit the question of punitive damages to the jury. See our discussion under Sections II and III, infra.

Mr. Ryan: Your Honor, I would ask for an offer of proof regarding the punitive damages. I think the fact that there were—All she does is talks about medical articles. How that relates to a punitive damage claim—I don't see how it relates to a punitive damage claim. I reviewed all her testimony. I don't see where she makes any mention of conspiracy, fraud, deceit or any of the allegations that Plaintiffs make in this case.

The Court: Mr. Shein?

Mr. Shein: Punitive damages is arrived at by a compilation of all of the Plaintiff's evidence. Part of that evidence will be certain documents from other witnesses, certain depositions, certain letters. But a vital part of that evidence will be how crystal clear it was, very, very early on what would happen to exposed individuals and how nothing was done about it. And that, to us, sir, is absolutely vital in part of our punitive damage claim, sir.

After some discussion regarding certain deletions from Dr. Sturgis' deposition transcript, the following exchange took place:

Mr. Ryan: We go back to my original question. What is the offer of proof as to punitive damages?

Mr. Shein: I thought I already answered that.

The Court: He already answered that. There's going to be, I assume—I may be in error, but I assume that Dr. Sturgis is expressing comment and opinion and report on what was known medically through the publications which were broadly disseminated from some time in history down to the time that she was testifying.

Mr. Ryan: Your Honor, our position is that I don't think that that is an adequate basis or a foundation for a punitive damage claim. I understand negligence.

The Court: Standing alone clearly no. But if, for example—And I am not teaching anybody anything—there is thereafter testimony of persons on the staff of Johns-Manville or Pacor who were physicians or who made it their business or who had the responsibility of reviewing such literature and such documents and digests of such literature and publications, and who may have brought to the attention of corporate executives the contents of these materials and thereafter nothing was done, or what was done was inadequate, Mr. Ryan, the Court can see how that could be probative in support of a claim for punitive damages.

Mr. Ryan: Well Your Honor, I will leave it to your discretion as to what procedure we should follow in making or renewing further objections that were made on the record or objections that we would also want to make as to materiality and relevance.

On the basis of this exchange and after consideration of much of the proposed evidence itself, we permitted plaintiff to submit evidence at trial which was relevant and probative both on the claim predicated upon negligence and the claim for punitive damages.[8]

At the conclusion of plaintiff's case, we surveyed the evidence which had been presented and considered the various arguments advanced by counsel for and against a claim for punitive in addition to compensatory damages. We concluded that there

---

8. The admission of certain evidence bearing on the issue of punitive damages was challenged by defendant Johns-Manville. We address these challenges in our discussion of defendant's motion for new trial, commencing at 18, infra.

was insufficient evidence presented *in this case*[9] which tended to prove plaintiff's contention that he was the victim of outrageous conduct[10] on the part of defendant. What we considered at trial and presently on review regarding the punitive dam-

9. After a lengthy discussion of the application of Pennsylvania punitive damage law to the asbestos litigation, Plaintiff's Memorandum of Law in Support of its Motion for Partial New Trial at 14-21, the following appears: "It should be noted that all of counsel's preceding arguments are based upon defendant's conduct generally, i.e. the failure to act and continuing to sell its products in a defective condition with full knowledge of the hazards involved. Yet, in this case there is more upon the record than these generalities." Id. 21. What follows is a discussion of certain documents and correspondence, some of which we ruled were inadmissible on grounds of materiality or relevance in the matter sub judice. In light of the evidence properly admitted in this case, we stand on our earlier ruling.

10. See, Chambers v. Montgomery, 411 Pa. 339, 192 A. 2d 355 (1963) citing with approval Restatement (Second) of Torts, §908 Comment b ("Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with reckless indifference to the interests of others . . . ") Under the Sub Committee Note of Pennsylvania Standard Jury Instruction, No. 14.00, the following appears: "Notwithstanding the Pennsylvania Courts' approval of the Restatement's exact language and the fact that an award of punitive damages as well as the amount is always within the jury's discretion . . . under a charge which gives precisely the same definition to both reckless conduct and to that type of conduct which would permit a punitive damage award the jury may feel they are compelled to award punitive damages when they find the defendant's conduct is reckless or to not find the defendant's conduct reckless lest they must then award punitive damages. Consequently, the term 'reckless indifference to the interests of others' is made a subordinate element of the term 'outrageous conduct' in the instruction to impart the idea that something more than reckless conduct . . . is necessary in order to justify a punitive damage award." See also, N.T. 5.113-114 and Plaintiff's Memorandum of Law at 2-9.

ages issue was the sufficiency of the proffered evidence tending to prove what Johns-Manville knew or should have known about the hazards of asbestos exposure and what actions it did or should reasonably have taken as a result of that knowledge *prior to and during* plaintiff's employment from 1943 to 1945 at the Philip Carey plant. Accordingly, any testimony, medical data or industry correspondence regarding the state of defendant's knowledge as it reflected upon plaintiff's later exposure while employed at Nicolet in the 1970's, after warnings were affixed to the asbestos-containing products, would go not to the issue of punitive damages but to the jury's consideration of the adequacy of such warnings. There was not a scintilla of evidence presented at trial which warranted our giving an instruction to the jury on punitive damages for plaintiff's period of exposure during that later period when warnings were so affixed.

It has long been the law of this Commonwealth that where the evidence will not support a punitive award, the jury should be limited to a consideration of compensatory damages only. See e.g. Pittsburgh Southern Railway Co. v. Taylor, 104 Pa. 306 (1884); Golomb v. Korus, 261 Pa. Super. 344, 396 A. 2d 430 (1978). Application of this principle led to our ruling at trial which plaintiff now challenges. Review of the entire record convinces us that plaintiff's motion for partial new trial on the issue of punitive damages must be denied.

## III. DEFENDANT'S MOTION FOR NEW TRIAL

In its motion for a new trial, Johns-Manville challenges perceived errors in (a) various evidentiary rulings, (b) in the court's response to certain remarks by plaintiff's counsel and to the playing of

certain portions of wife-plaintiff's videotape deposition, (c) in the court's failure to poll the jury regarding the impact of certain newspaper and television shows, (d) in our instructing or (e) failing to instruct the jury on various points of law and (f) in our decision concerning joinder of additional defendants. We deny defendant's motion for the reasons discussed below as to each of these grounds:

### a. Evidentiary Rulings

Dr. Smith Depositions. Johns-Manville contends that it was error to admit into evidence two depositions of the late Dr. Kenneth W. Smith, former medical director of the Johns-Manville Corporation, which were taken on January 13, 1976 in connection with the case DeRocco v. Forty-Eight Insulations, Inc., July term, 1974, nos. 2880, 2881 (Allegheny C.C.P.) in Pittsburgh, Pennsylvania and on April 21, 1976 in connection with the case Louisville Trust Co. v. Johns-Manville Corp., Jefferson Circuit Court, Common Pleas Bench, Seventh Division, no. 164-922, in Windsor, Ontario, Canada. Johns-Manville was a defendant in both cases. Defendant objects to admission of the evidence on the following grounds: that the testimony was immaterial and irrelevant because inter alia, it concerned facts outside the time frame of this case, that the evidence did not conform to applicable rules of procedure, and that the probative value of Dr. Smith's testimony on the punitive damages issue was outweighed by prejudice to defendant.

Since plaintiff began working for Philip Carey "around the middle of 1943" and worked there until the "middle of 1944 or the beginning of 1945" while Dr. Smith did not become a Johns-Manville physician until 1944 and medical director until 1946, it is

asserted that "the overlap of time, if any, was short and therefore the substance of Dr. Smith's testimony relates to facts [such as Johns-Manville's knowledge concerning the hazards of asbestos] outside the time frame of plaintiff's employment." JM 40. This argument is without merit. Given his undoubted familiarity with company records and prior policies, Dr. Smith's expertise, particularly in regard to his acquaintance with the corporation's knowledge of industrial hazards, cannot reasonably be circumscribed by the exact dates of his employment. As a medical specialist, Dr. Smith entered a corporate environment the previous contours of which he had to learn before being able to discharge his duties effectively. If anything, the lack of exact correspondence between the period of plaintiff's exposure to asbestos products and Dr. Smith's tenure at Johns-Manville affects the weight, not the sufficiency of the evidence. Defendant contends that the issue involved in the cases where the depositions were taken (insulators working with finished asbestos products) was different from the issue involved here (oven loader working with raw asbestos fiber). We have previously rejected a similar argument and we do so now as specious. See, Noecker, at 43.

Defendant's contention that procedural irregularities should have barred admissibility of Dr. Smith's testimony in the 1976 deposition was previously rejected on the grounds that the transcript manifested "sufficient reliability to comport with our notions of fairness to the party against whom the testimony is sought to be used . . . " Noecker, 42-43. We see no reason to depart from our earlier observation.

Finally, defendant argues that the probative value of the Smith depositions on the issue of puni-

tive damages was outweighed by the prejudice to defendant and that under the circumstances presented, holding them admissible constituted reversible error. We do not agree.

At the onset of trial, an offer of proof on the issue of punitive damages was proffered. We permitted evidence to be presented to the jury which bore on this issue and which, coincidentally, was also relevant to the issue of liability under a theory of negligence. Prior to the submission of Dr. Smith's testimony, Johns-Manville argued that the prejudice of certain of his statements outweighed their probative value, an argument we rejected at the time.

At the conclusion of plaintiff's case, we considered all of the evidence reasonably bearing upon plaintiff's claim for punitive damages and found that evidence insufficient to warrant an instruction to the jury on that claim. Johns-Manville did not challenge our decision barring plaintiff from submitting the punitive damage claim to the jury at the time it was made, nor do they challenge it now. Johns-Manville also failed to request that a cautionary instruction be given to the jury at the time of our charge to mitigate any prejudice which defendant perceived at the time.[11]

Accordingly, our decision to permit the admission of certain challenged portions of Dr. Smith's deposition testimony cannot be construed as error under the circumstances presented.

Wilbur Ruff Deposition. Johns-Manville also contends that it was error to admit into evidence

---

11. Defendant similarly failed to request a cautionary instruction regarding Wilber Ruff's testimony, the Sumner-Simpson correspondence and the ATI minutes. See our discussion commencing at 21 infra.

portions of the deposition of Wilbur Ruff dated February 14, 1978 and taken in the case of Browner v. Johns-Manville Corporation, Superior Court of California, County of Conta Costa, no. 162, 127. Wilfur Ruff was Superintendent of Production Planning for defendant from 1947 until 1961 and from 1963 until 1966 he was plant manager for Johns-Manville at its Pittsburg, California plant. Defendant's objection to the Ruff deposition are similar to those raised regarding the Smith depositions. We will address them seriatim.

Johns-Manville argues that due to the lack of congruence between the dates of plaintiff's asbestos exposure and Mr. Ruff's affiliation with defendant, the deposition testimony was erroneously admitted. As we have previously noted, this factor goes to the weight and not to the sufficiency of the evidence. Johns-Manville also argues that the lack of identity between parties and issues in Browner, supra, and the matter sub judice should have rendered the Ruff deposition inadmissible. This argument, too, is without merit. Johns-Manville Corporation was a party to the Browner case and the products liability claims involved in that action were virtually identical to those which have been litigated here. Finally, defendant again contends that this testimony was prejudicial, given our ultimate ruling on the punitive damages issue. As we have already noted, there is no substance to this contention.[12]

Sumner Simpson Documents. Plaintiff offered into evidence two documents from the files of Sumner Simpson: a letter from Miss Rossiter of Asbestos Magazine to Mr. Simpson dated September 25, 1935 and a letter from Vandiver Brown

12. See, our discussion at 675, supra.

dated October 3, 1935 referring to the earlier Rossiter letter to Mr. Simpson. Johns-Manville attacks our decision allowing these documents to be admitted into evidence on basically two grounds: that the letters were inadmissible hearsay, in particular that they did not fall under the business records exception of the hearsay rule and that at least one of the letters was not properly authenticated.[13] Regarding the first argument, it is our view that the October 3 letter was properly admitted under a different exception to the hearsay rule, namely, as a declaration against interest. Vandiver Brown signed this letter in his capacity as attorney for Johns-Manville. He may also have been secretary of the corporation at the time. Given these factors we were persuaded that Mr. Brown had the apparent authority to speak for defendant and deemed the October 3 letter admissible under the stated exception.[14] The only challenge to the September 25 letter concerned its authenticity. The following exchange occurred at trial:

Mr. Ryan: I also don't know how this letter signed by Rossiter has been authenticated. That's my other objection.

The Court: It's been authenticated in the context of the letter from Brown to Simpson. It specifically refers to enclosing copy of the September 25th letter from the editor of the magazine Asbestos. The letter from the magazine is dated September 25, 1935 and it is under the caption of "Asbestos." So, there is an internal confirmation.

---

13. Defendant's argument that introduction of these documents in light of our exclusion of punitive damages in this case was prejudicial to defendant has already been explored at length. See, section II, supra.

14. No challenge was raised concerning the authenticity of Vandiver Brown's signature.

In light of the above, we are of the opinion that these two documents were properly admitted.

ATI minutes. Plaintiff offered into evidence several portions of the minutes of the Asbestos Textile Institute (ATI). Johns-Manville maintains that admitting these documents was highly prejudicial given their probative value and our discussion of the punitive damages issue and that they were immaterial since they concerned a time frame different from the periods of plaintiff's work exposure. We have already discussed each of these charges at length. Defendant's further argument that those portions of the ATI documents concerning Dr. Heuper's study on the environmental causes of lung cancer were irrelevant because plaintiff did not suffer from cancer, is also without substance. It totally ignores the thrust of plaintiff's claim as to the duty to warn and the adequacy of warnings when they did appear; consideration of adequacy of warning can only be meaningful if there has been a full exposition of the risk which is the subject of the warning. Furthermore, the probative value of this material exceeded its inflammatory nature, if any, and in our view, the ATI minutes at issue here were properly admitted.

### b. Plaintiff's Counsel's Remarks. Opening Remarks and the Videotape Deposition.

Johns-Manville urges that a new trial be granted because of the prejudicial effect of certain remarks by plaintiff's counsel to the jury and certain deposition testimony presented by videotape. Our discussion will consider challenges involving the opening statement, the closing statement and the playing of Mrs. Gill's deposition on a videotape machine.

The opening statement reads, in part, as follows: Mr. Shein:

• • •

Earl Gill has read recent articles and has knowledge that one who is exposed to asbestos and one who has asbestosis can develop cancer, and a type of cancer called mesothelioma. And Earl worries about that. Earl worries and worried whether from his wife shaking out those clothes she might get it, because he read somewhere that that might happen. Those are legitimate worries. And as Judge Takiff will instruct you, legitimate claims. But Earl's worry on that score is at an end, because ladies and gentlemen, Earl's wife now has asbestosis.

Mr. Fitzgerald: I object to that, Your Honor.

The Court: The objection is sustained.

Mr. Shein: I thought the ruling[15] was that I could say that.

The Court: That's not the ruling. You were permitted to expound on the subject of mental state. The other is a matter of an entirely separate lawsuit.

Mr. Shein: All right, sir.

The Court: And, is not for consideration of this jury.

Mr. Shein: All right, sir.

Johns-Manville contends that our instruction was "insufficient to overcome the prejudicial effect and arousal of sympathy for plaintiff which plaintiff's counsel's statement evoked." JM, 55. We disagree.

A trial judge should be capable, by virtue of his unique position and status in the courtroom, of assessing the effect which a particular remark has

---

15. This ruling was made at an in camera conference the morning trial commenced, November 23, 1981. A court stenographer was not present at the time to record this exchange.

upon the jury members. In the judgment of this court, the corrective advisements given to plaintiff's counsel in the hearing of the jury was sufficient under the circumstances to counter-balance any effect which counsel's words might have had in arousing sympathy for Mrs. Gill, whose only claim in this case was for loss of consortium. Further instructions to the jury in explication of the admonition might well have highlighted and emphasized the impropriety. Defense counsel was apparently of the same mind since no motion for withdrawal of a juror or for a mistrial was submitted. Compare, Todd v. Lit Brothers, 381 Pa. 109, 112 A. 2d 810 (1955). Under the circumstances, we hold that our instruction cured any prejudicial effect which plaintiff's counsel's opening remarks may have had.

Closing Remarks.

One of the challenged portions of plaintiff's counsel's closing statement reads as follows:

Mr. Shein:

• • •

If you, as a Jury, were to decide that the knowledge of the employer defeats the case, then what are you doing? You are letting the person who isn't labeling his product off scott free, and you are relegating the employee to Workmen's Compensation, which in Earl Gill's case he already gets, so he would get nothing. How can you do that? Our system of justice cries that the wrong doer pays. Under this theory, the wrong doer would be walking away laughing.

Mr. Ryan: I object to this.

Mr. Fitzgerald: Objection.

Mr. Shein: And the worker would be getting nothing.

The Court: Overruled.

• • •

Ladies and gentlemen, I'm about finished. We've gone through, in this trial, testimony of various doctors who were employed by Johns-Manville, testimony of various people who were employed by Johns-Manville. It's not anything I made up. It's something they said under oath. We've tried to show you over the past two weeks that this company systematically was keeping a hush-hush on what was happening. That's what this case is all about. (N.T. 1.41-1.42.)

And from an earlier portion of the closing speech:

Now, let's talk about these letters [in the Sumner-Simpson correspondence] for a moment. There are certain things that we know from them. We know that by 1935 Johns-Manville was quite aware of the word asbestosis. We know that. You all now know, remember that education I told you you were going to get in the next couple weeks, you now know that the Merewether, and these names are getting familiar to you, the Merewether reports and other reports from England were causing changes in legislation in England about asbestos exposure, all before Earl Gill was ever exposed to his first asbestos fiber. We know that. So, what does this letter tell us? It says two things. The less said the better. What does that mean? Don't tell—it's got to mean only one thing, as reasonable people. Don't tell them what you know. Why? Because it's going to interfere with sales. And, use the English reports.—I'm sorry, don't use the English reports. Why? They're worse.

Johns-Manville argues that these speeches were an attempt by plaintiff's counsel to secure an award of damages which were punitive in nature rather than compensatory and that the resultant prejudice was highlighted since we had already held that

here was insufficient evidence to submit the issue of punitive damages to the jury. "These arguments by plaintiff's counsel in closing argument served only to paint a picture of defendant as participating in a conspiracy to cover up information because of pecuniary motives. No such evidence existed." JM 66. We disagree with defendant's contention for two reasons. Plaintiff's counsel's statements invite the jury to draw certain conclusions from the evidence—in particular the Sumner-Simpson correspondence—which the jury was instructed by the court to give such weight, if any, as it merited. Furthermore, had plaintiff's theory of liability been grounded solely on 402A, defendant's argument regarding plaintiff's indirect attempt to secure a punitive damage award might be persuasive. But almost without exception, each piece of evidence which could have supported plaintiff's unsuccessful quest for punitive damages also supported their successful arguments regarding standard of care under negligence principles. Hence, in this context, Johns-Manville's charges of prejudice in this regard are without merit.

Johns-Manville argues that these remarks "were not a discussion of the evidence and were intended solely to arouse the sympathy of the jury and prejudice them against the defendant." JM 62.

The realities of the courtroom suggest that arousing the sympathy of the jury on behalf of one's client is part of the function of the vigorous trial advocate. A critical evaluation must be made of the means utilized to achieve this end. For purposes of a motion for a new trial, those means must be found to be "inflammatory or beyond the limits of fair or sound argument, and unduly influencing or distracting the jury." Easter v. Hancock, 237 Pa. Super. 31, 346 A. 2d 323 (1975). Defendant is of the view that

the above-quoted remarks focus on irrelevant information, namely plaintiff's financial condition. In our view, they do no such thing. Plaintiff's counsel was merely referring to the uncontroverted fact that if Philip Carey, his employer, were found to be the sole proximate cause of plaintiff's injury, as defendant's counsel had vigorously asserted, plaintiff could recover no more from his employer than the workmen's compensation payments he already receives and nothing at all from the Johns-Manville Corporation, we addressed this subject, in accordance with defendant's requested points for charge, in instructing the jury on legal cause and superceding cause.

Regarding plaintiff's counsel's personification of defendant as "walking away laughing" and getting off "scot free" we are of the view that the bounds of propriety may have been touched by these remarks, but in the context of the entire closing statement, not exceeded.

Defendant further contends that the following remarks by plaintiff's counsel in his closing statement were improper and unduly prejudicial because they lacked evidence to support them.

Mr. Shein:

### Videotape Deposition

Plaintiff's spouse, Betty Gill testified in the trial by way of videotape deposition. Certain portions of that deposition, in particular, references by Mrs. Gill to her own medical condition which is the subject of another law suit, were ordered deleted.[16] However, during the course of playing that videotape, some portions of the deposition referring to

16. No information on Mrs. Gill's age or life expectancy was given to the jury.

her physical condition which were to have been deleted were in fact played twice before the jury. Defendant's objections were on the grounds that playing these supposedly deleted portions in conjunction with plaintiff's counsel's reference to Mrs. Gill's asbestosis in his opening statement[17] served only to emphasize her asbestos-related disease and to create an association, in the jury's mind between her alleged illness and her husband's injuries; an association allegedly causing undue sympathy toward plaintiff and prejudice to Johns-Manville. We were aware of this possibility and addressed it almost immediately after the aforementioned videotape presentation as follows:

The Court:

• • •

Before we adjourn for lunch, . . . since we have just seen and heard the testimony of Mrs. Gill, let me put her testimony into perspective for you. You recall throughout the trial I've tried to indicate to you how, number one, we were starting two cases. We've eliminated one of them. We're down to one case.

This was a reference to an earlier decision to try Mrs. Gill's independent claims separately from those asserted by her husband. After discussing some other matters, we continued:

But what is the nature of her claim [in this action]? Under our law when one spouse is injured, physically, the other spouse may also have a claim. Where it's a wife, we call it a claim for consortium. Consortium is a very fancy word. I hesitate translating it into its precise dictionary meaning, but in the context in which it is used in the law a wife's

17. See our discussion at 685, supra.

claim when her husband has been allegedly injured through someone else's fault or responsibility is for the loss of the husband's companionship, services, society. These are the things that are encompassed in the general description or the technical word that we use as "consortium." That is the nature of Mrs. Gill's claim; that by virtue of the fact that her husband has been rendered disabled, injured, that thereby her rights and her privileges as a spouse, as a wife, have been adversely affected. Her claim is derivative, it flows from his claim. And it encompasses these matters concerning which I've just described to you. The things that a husband does for a wife, the things that—the kinds of society and services that a husband has and renders to his wife. These are encompassed under that legal term known as consortium. And, her's is a claim for loss of consortium. That's the only purpose for which her testimony was submitted and exhibited to you. She's not a physician. She's not qualified to testify and give any diagnosis or medical opinion or anything of that sort. But, her's is a derivative claim based upon her husband's claim. A wife cannot recover if the husband cannot recover. Her claim is derived from him. If the husband is entitled to recover, then the wife may prove and may recover for her loss by reason of being deprived, being diminished in the services, the companionship, the society that her husband rendered to her.

Members of the Jury, I'll probably cover part of this in my final instruction to you. But since we have just completed receiving her testimony and since you heard a variety of objections being voiced throughout her testimony, I thought this might be an appropriate time for you to have the court's explanation to suggest what it is that she asserted in the claim at this time.

In our view, this lengthy instruction to the jury adequately counterbalanced any confusion or undue sympathy Mrs. Gill's references to her own condition have provoked in the panel. Apparently defendant's counsel concurred in the court's opinion as to the sufficiency of the continuing instruction; nothing further was requested. A claim of error post trial is untimely.

### c. Requests to Poll the Jury. Prejudice of Inquirer Article

On November 23, 1981, an article entitled "Death Down the Line: Asbestos and the Railroad Workers" appeared on the front page of the Philadelphia Inquirer. This trial began on the same day. Defendants argued that the article was inflammatory, discussed issues of liability which were proably inadmissible as evidence and stated that the asbestos manufacturers, including defendant, had knowledge of the hazards of asbestos and refused to share this knowledge with asbestos workers. Accordingly, defense counsel requested a voir dire of each member of the panel to determine if any of the jurors read anything that might have influenced them in this particular case. The request for individual voir dire was denied. The following exchange reveals the rationale for that ruling:

The Court:

• • •

I respect the necessity to avoid the impact on Jurors of the irrelevant and the immaterial and that which is so prejudicial that it will taint their minds and the like, but, gentlemen, on the subject of asbestos and news items concerning asbestos, I know of no way that one can conceivably realistically,

factually insulate and isolate Jurors from the known materials relevant to asbestos and its consequences.

• • •

Asbestos can be a deadly material even as can a bullet, and we will go forward. We will try our best to instruct the Jury, as I have time after time, to confine their deliberations and their opinions and their concerns with that which comes into the courtroom. If you wish me to, I will instruct them not to read this article or not to read any other article.

My own judgment is that if I make such an instruction, I will be focusing their attention, but will be pleased to follow your request in that regard.

Mr. Ryan: Your Honor, I agree with Your Honor in not making the particular instruction that you referred to, but I do think that it would behoove us to determine if in fact the Jury has read anything over the weekend or this morning, or at least make some kind of indirect inquiry to find out whether they have seen anything between Friday and today that may have some influence on their thinking on this particular case. I leave it to Your Honor's discretion.

The Court: Would you want a per diem inquiry day after day if this is followed up by another article, and each time that you make such an article again focus attention on what otherwise might not have been seen?

Mr. Ryan: Your Honor, I can't imagine any situation where this article is not going to be seen.

The Court: Nor can I, very candidly.

Mr. Ryan: I think something should be done.

The Court: The something that can be done is the necessity for the Court to admonish the Jury now and throughout the trial not to pay any atten-

tion and not to consider anything that doesn't come within this courtroom and as a part of this case.

In accordance with this observation, we instructed the jury as follows:

The Court:

• • •

The Press, the radio, television is constantly floating information and reports of a variety of natures. I have no control over them. I can only ask you in the interest of the solemnity of the oath that you took and consistent with that oath, during the course of the trial put aside affirmatively, reject and avoid reading or observing or listening to anything that in any manner touches the matters that are before you.

That's pretty hard to do and I respect that. I can't ask you to stay in cotton wadding and isolate yourselves off from the rest of the world during the days or weeks, whatever it is, that we are together trying this case. And yet intellectually I must ask you to do that. I must ask you to affirmatively make the effort of rejecting, blocking out these outside influences.

Because, again, members of the jury, they introduce that which is irrelevant, which is not appropriate for your consideration in this case. They will report and comment and depict matters that are not properly before the Court and are not in this courtroom under the supervision of the trial judge and subject to examination and cross-examination by these lawyers. And the cross-examination and examination process, members of the jury, isn't a procedure that is designed for entertainment; it is a procedure that has been carved out of generations of experience as a method of dissection and analysis to assist one in finding the truth. And if you hear and see something that is not before the court,

then the lawyers do not have that opportunity of examination and cross-examination, and you are subjected to a contamination that would be inappropriate. I, therefore, ask you, members of the jury, to seek to avoid affirmatively exposing yourselves in any manner to these outside influences and outside matters that are truly not appropriate for your consideration.

At the time of trial, we were of the view that an individual voir dire would have directed undue attention to the Inquirer article, opting instead for the more general cautionary instruction quoted above. No further action was then sought by defendant and we presently decline to rule our action as error warranting a new trial.

Prejudice due to T.V. Show. Our discussion of the Inquirer article applies with equal force to Johns-Manville's contention that our failure to grant a mistrial following the airing of a television story about defendant's involvement in certain asbestos cases constitutes grounds for a new trial. On December 1, 1981, NBC's Today Show aired segments concerning lawsuits, particularly the Speakes case then being tried in California, which, according to defendant suggested that Johns-Manville was not advising workers of hazards in its Pittsburg, California plant and as a consequence of this and related actions was facing impending doom as a corporate entity. Defense counsel requested an individual poll of each juror, a request which was denied because focusing on the news report of something occurring in California would give undue emphasis to it. A request for declaration of a mistrial was also denied. At the end of the day on December 1, we gave the following instruction:

The Court:

•••

I want to repeat to you, members of the Jury, a further admonition that I gave you early in this case. We try the case of Mr. and Mrs. Gill against Johns-Manville solely upon the basis of the evidence and the testimony that comes from this witness stand, and in your presence and in presence of this Judge in this courtroom. I plead with you if at any time you see, hear anything about anybody else, any place in the world involved in any matter—in any manner with asbestos or anything else, please ignore and put that out of your mind. That is not before you. That case is not before you. Those matters, the information, the communication, the reports, whatever they are, are not in a court such as this and not in this matter. And, I would ask you to consciously avoid and refrain from reading, looking at or listening to anything about anybody else other than this present case, insofar as the subjects which are before you in this matter.

This admonition was sufficient under the circumstances and Johns-Manville's motion for a new trial on this ground must be denied.

### d. Instruction Concerning Aggravation of Pre-Existing Injury.

Johns-Manville argues that our instruction on the aggravation of a pre-existing condition was error because the evidence failed to support such a charge and no such claim was made by plaintiff.

In the course of instructing the jury on damages we said the following:

The Court:

If, for example, in this case you conclude that asbestos exposure was a substantial cause of his injury and you find that asbestos was a defective

product, as I have defined it, and if you also conclude that the injury was enhanced or accelerated by his past smoking so that he has an obstructive lung condition due to asbestos inhalation, you might inquire, you might ask me if the damages are to be reduced; that is, are the damages caused by asbestos to be reduced because that injury was increased or made worse by reason of the fact that he also was a smoker and that by reason of smoking he enhanced, he increased the extent of injury resulting from the inhalation of asbestos?

I say to you, members of the jury, the ans[w]er is no. You do not abate. You do not reduce a verdict by virtue of the fact that there may have been an enhancement, an increase of the injury because the asbestos-related disease was combined with something else.

What's the reason for this? And I always look for the reason in the law. We have a doctrine in the law that a wrongdoer, a person or an entity that commits liability creating conduct, takes the person in whatever state he or she may be when the injury is caused. The mere circumstance that the injury was caused to a person who may also have been weakened or impaired by reason of some other cause and, therefore, the original wrongdoer, the original liability creating person caused an injury which was worse in its consequences than if it had been caused to one who was not suffering from some other cause, that will not reduce the entitlement of the person injured to recovery.

Defense counsel objected to this instruction as follows:

Mr. Ryan: Your Honor, last is the instruction concerning the injury was enhanced by past cigarette smoking. Frankly, I didn't quite fully un-

derstand the charge and I think that it could be somewhat confusing to the Jury about Mr. Gill's prior lung condition.

The Court: Would you like me to restate the concept that the wrongdoer takes his victim as he finds him, and if he finds a smoker and inflicts asbestos inhalation on him, the fact that the harm from the asbestos is higher, greater, more pronounced than that which would be incurred on the inhalation of asbestos by a non-smoker? Do you want me to do that? That, nevertheless, the tort feasor or the wrongdoer is liable for the heightened injury? I think that's what I said, and I think that's the law.

Mr. Ryan: I just think that particular charge was not necessary in this case.

The Court: Very well. You are not saying that what I said was wrong; you are saying you didn't think it was necessary under the facts.

Mr. Ryan: A combination of both. Frankly, it may have been due to my lack of comprehension; I just didn't follow it.

In its motion for a new trial, Johns-Manville states that review of the complaint fails to disclose any claim for what it denominates as aggravation of a pre-existing disease. Defendant also failed to observe that sufficient evidence on this issue was presented at trial. Our own survey of the trial evidence however, leads us to a different conclusion on the basis of which we gave the preceeding instruction. The direct examination of plaintiff included the following exchange:

Q. Are you presently a smoker, sir?
A. No, sir.
Q. Were you in the past a smoker?
A. Yes.

Q. When was it that you started smoking and when was it that you stopped smoking?

A. I started to smoke when I was about eighteen, and I stopped in '77.

Q. Why did you stop in '77?

A. Well, I started to see some of these warnings, [on cigarette packs] and with the advice of Dr. Weiss he said it would help me if I did stop.

Defense counsel explored plaintiff's smoking history on cross-examination. In addition, Dr. William Atkinson gave the following testimony after a discussion of Mr. Gill's life expectancy:

By Mr. Shein:

Q. Doctor, Mr. Gill has been a smoker. You have that in your history, sir?

A. Yes.

Q. How does that affect this whole picture that we're talking about?

A. Makes it worse. It makes the amount of retained asbestosis dust worse and it also independently causes lung damage of a different type, which compounds the symptomatology and the dysfunction of the lung.

Q. What is the relationship, Doctor, between smoking and asbestos exposure and lung cancer?

A. Mr. Fitzgerald:

I object to this Your Honor.

The Court:

Objection is sustained. Rephrase the question, and confine yourself to this patient, if you would.

Mr. Shein:

Okay.

By Mr. Shein:

Q. Doctor, Mr. Gill having asbestosis, is he or is he not more prone or susceptible to other asbestos-related diseases?

A. He's more susceptible.

Q. Would you explain that, sir?

A. Asbestos causes cancer of the lung.

Mr. Fitzgerald:

I object:

The Court:

Overruled.

The Witness:

The risk of developing cancer of the lung in an asbestos worker is five to six times the normal population who's not exposed to asbestos. In addition to that, smoking causes cancer of the lung. And the risk is anywhere from 16 to 19 times the non-smoking population. If you put smoking and asbestos together in the same person, the risk of developing cancer of the lung is 92 times the normal population.

Without searching the record further, it is clear that our instruction was appropriate given the evidence presented. Plaintiff indicated that he started smoking when he was about eighteen, that is, around 1939,[18] approximately four of five years before he began working at the Philip Carey plant. Counsel for Johns-Manville elicited the information that Mr. Gill smoked two, sometimes three packs of cigarettes a day throughout this period.[19] Dr. Atkinson's testimony that asbestos exposure "compounds the symptomatology and the dysfunction of the lung," together with plaintiff's earlier testimony regarding his smoking history is sufficient to warrant the instruction which was given.

### e. Requested Instructions

Johns-Manville asserts that it is entitled to a new

---

18. Mr. Gill testified that his birthdate was May 5, 1921.

19. N.T. 3.101

trial because the court failed to instruct the jury on the following: that employer conduct could be considered in determining the proximate cause of plaintiff's injuries; that in considering the duty to warn, the jury could consider the sophisticated purchaser defense; that the employer has a legal duty to provide a safe place to work; and that failure by the husband-plaintiff to wear a respirator at the work place constitutes a failure to exercise due care. We discussed each of these matters, save the last, in our consideration of defendant's motion for judgment n.o.v. See discussion, supra. The fact finder was instructed to determine whether defendant's product and/or conduct was *a* substantial cause of husband-plaintiff's harm. To direct the jury's attention on another entity, not a party to this action, whose conduct may also have been a substantial cause of harm in the manner requested, would raise an unnecessary cloud of confusion without any competent or probative evidence upon which the requested instructions could be predicated. We were invited to frame a non-issue for consideration by the jury. We rejected defendant's invitation regarding these instructions at the time of trial.[20]

---

20. See, e.g., the following exchange:

Mr. Ryan: Well, Your Honor, I would contend even though the employers aren't in the courtroom, it doesn't mean they still can't be at fault in some way.

The Court: They could be. But not to the—how do we determine that to the extent of exculpation for the supplier?

Mr. Ryan: Your Honor, I think it goes to the proximate cause question.

The Court: What evidence do I have to go to the Jury on that?

Mr. Ryan: As I said before, I think it's from the articles—

The Court: From the literature? What do I have with respect to Nicolet and Philip Carey? I'm not trying a literature case.

Mr. Ryan: *I basically agree there's no specific evidence as to the activities of either of those employers—*

In Point for Charge No. 43, defendant made the following request for instruction from this court:

At the time and place about which you have heard evidence, it was the duty of the plaintiff to exercise ordinary care for his own safety and that duty included the duty to wear a respirator at all times while working with asbestos products. If the jury believes from the evidence that a respirator was available to plaintiff and that he failed to observe the duties imposed upon him by this instruction, then you must find for the defendant.

We observed at the time: 43, denied as stated. It may be argued on the negligence aspects of the case. I affirm it in principle. I deny it as stated. I will not charge that a failure by plaintiff to wear a respirator constitutes a failure to exercise due care. That's argumentative and you may argue it if you choose.

Defendant correctly observes that the standard for determining husband-plaintiff's contributory negligence is his awareness of the danger to which he was exposed: Id. 145.

A plaintiff's conduct is measured by what he reasonably understood to be the circumstances

---

The Court: Am I inviting the Jury to speculate and hypothesize as to whether the place was or was not "a safe place?"

Mr. Ryan: It's not a question of whether or not the work place of Philip Carey or Nicolet was a safe place. It's the issue of whether or not the employer has an obligation to make a work place a safe place. If that was the thinking among suppliers that the way to prevent asbestos related disease was to control the dust at the work place.

The Court: You may argue this if you choose, that the supplier, manufacturer relied upon his assumption that the employer would provide a safe place. That's an argument. I will not charge that will in anyway exculpate the manufacturer.: N.T. 8.64-66. (Emphasis added.)

which surrounded him at the time. Included in these circumstances are his experience as a workman and the nature of the task he was required to perform. Further, an additional factor in determining whether a plaintiff is guilty of contributory negligenc is his awareness of the danger to which he was exposed: Id. 145.

Consideration of the evidence which defendant collates in its memorandum of law at 95-96 however, falls far short of demonstrating that husband-plaintiff had any such awareness during his period of employment at either Philip Carey or Nicolet.

Our refusal to submit an argumentative instruction to the jury was appropriate as was our refusal to charge on a point for which there was no supportive evidence.

## f. Joinder of Additional Defendants.

Finally, Johns-Manville argues that our orders granting its petition to join certain additional defendants in the 1977 action while denying its petition in the 1978 action were inconsistent and that the order forbidding joinder was prejudicial to the degree that a new trial is warranted. Johns-Manville is concerned that certain supplier defendants not joined in the 1977 action[21] can only be held accountable if it institutes an additional action, incurring thereby further expense while imposing what it deems to be an unnecessary burden upon the courts. While we share defendant's concern regarding judicial economy, the issue is, quite sim-

---

21. The 1977 and 1978 actions were consolidated for trial by our order of April 24, 1981.

ply, whether our denial of this petition in the 1978 action was so prejudicial to this defendant as to warrant the granting of an entirely new trial. Defendant fails to see the threat to judicial economy in this suggestion when, what would in all probability be a far less protracted trial, could dispose of Johns-Manville's various claims for contribution and/or indemnification. While we regret the inconvenience which our April 24, 1981 order denying defendant's petition to join may have caused, even assuming that this petition was denied imprudently, our decision did not yield such prejudice to Johns-Manville as to warrant granting it a new trial under the circumstances.

Wherefore, we have previously entered the following

## ORDER

And now, April 23, 1982, upon consideration of defendant Johns-Manville Amiante Canada, Inc.'s motion for new trial and motion for judgment n.o.v. and plaintiff's answer thereto, and after oral argument on this motion held on February 24, 1982, it is hereby ordered and decreed that these motions are denied.

## ORDER

And now, April 23, 1982, upon consideration of plaintiff's motion for partial new trial limited to the issue of punitive damages only and defendant Johns-Manville Amiante Canada, Inc.'s answer thereto and after oral argument on this motion held on February 24, 1982, it is hereby ordered and decreed that this motion is denied.